UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ARMAMENT SYSTEMS AND PROCEDURES,
INC.,

   Plaintiff,

 v.                       Case No. 01-C-1122

NORTHLAND FISHING TACKLE, INC.,

   Defendant,

 v.

THE CINCINNATI INSURANCE COMPANY

   Third-Party Defendant.

**ORDER**

   This case is before me on a motion for sanctions pursuant to Fed. R. Civ. P. 11. Northland Fishing Tackle, Inc. is one of the numerous companies sued by Armament Systems and Procedures for violation of Armament's patent on a miniature lighting device. In addition, Armament asserted a claim against Northland under Wisconsin law for falsely advertising that its product was manufactured in the United States. Northland was insured under a general liability policy and an umbrella policy of insurance from Cincinnati, both of which included coverage for "advertising injury." Based on the allegations of the complaint, Northland tendered defense of the Armament lawsuit to Cincinnati, which, after agreeing initially to defend and indemnify Northland, ultimately changed its mind and denied coverage. Following some failed attempts at negotiation, in November 2004, Northland sued Cincinnati as a third-party defendant in this action, asserting claims for

declaratory relief and breach of contract. Cincinnati answered and brought a counterclaim against Northland for declaratory relief seeking a determination that there was no coverage under its policy and it owed Northland no defense to Armament's suit.

Northland's counterclaim, which is incorporated by reference into its affirmative defenses, includes a series of paragraphs in which it recites various provisions of its policy under which it alleges coverage does not exist. Why Cincinnati elected to file a counterclaim in the first place is somewhat unclear. If Northland is denied the relief its seeks, namely, a determination that there is coverage under the policy and damages for its breach, it will of course be based on the conclusion that there is no coverage. If Northland loses, it cannot in good faith later sue Cincinnati for breach of contract for Cincinnati's refusal to defend it against Armament's claims and indemnify it for any damages for which it is found liable. In other words, defeating Northland's claim affords Cincinnati the very relief it seeks by counterclaim. But even aside from this, it appears a waste of time and effort for Cincinnati to recite all of the various provisions of its policy, even those under which no assertion of coverage has been made, merely to assert no coverage is provided. A general allegation that its policy does not provide coverage, or that any coverage otherwise provided is excluded, would seem to have been sufficient to provide Northland the notice that the federal rules require a pleading to provide. Instead, Cincinnati has set forth four pages of policy language interlaced with assertions that there is no coverage or coverage may be excluded. Northland contends that many of the assertions made by Cincinnati in its counterclaim are baseless and without factual support. After first attempting to discover the factual bases for Cincinnati's assertions by interrogatory, Northland filed a motion for sanctions under Fed. R. Civ. P. 11, claiming that Cincinnati has been

2

unfairly obstructing the litigation of the merits of the underlying dispute. It is that motion that is presently before me.

The crux of Northland's complaint is that Cincinnati's counterclaim, which was filed in December 2004, contains several affirmative defenses (e.g., exclusions for violations of criminal law, statute of limitations) that have no plausible bearing on this case. (Docket # 64.) Indeed, paragraph 10 of the counterclaim, entitled "Bases For a Finding of No Coverage or Defense Obligation," appears to be a laundry list of defenses that could potentially apply in *any* insurance coverage defense. The section states that Cincinnati is not liable for "one or more of the following reasons," which include the assertion that the injury in question was not a covered personal injury; but if it was, it did not arise out of Northland's business; but if it did, it occurred outside of the policy period, etc., etc. In other words, Cincinnati is simply reciting its policy language and exclusions to the effect that no matter what Northland's claim is, Cincinnati's numerous exclusions "may apply" to thwart coverage.

When Northland asked, via interrogatories, what factual support it had to back up its myriad defenses, Cincinnati, after first complaining that Northland had exceeded the number of interrogatories allowed under the local rules, replied with another boilerplate response: "Cincinnati objects to this interrogatory on the basis of attorney client and work product privileges, and on the basis of over breadth and undue burden. . . . Cincinnati states that the respective paragraphs of its counterclaim are based upon the allegations of the complaint and upon factual information provided to Cincinnati and/or its counsel by Northland and/or its counsel." (Leach Decl., Ex. K.) In other words, Cincinnati is saying to Northland, "you shouldn't need to ask us about our defenses because they are based on what your complaint states and what you and/or your counsel told us." Northland

3

also alleges, in its reply brief, that Cincinnati's counsel improperly revealed confidences violative of the attorney-client privilege and a joint defense agreement the parties entered early on in the litigation.

Naturally, Cincinnati sees matters differently. First, it claims that Northland's interrogatories were themselves improper because they were simply a parroting of the answer and affirmative defenses phrased as a "please explain" inquiry. This sort of boilerplate contention interrogatory, Cincinnati asserts, is wasteful and abusive because it essentially asks for a line-by-line statement of the other side's case. Second, Cincinnati claims that, following meetings with Northland's counsel, it has agreed to withdraw several of its counterclaims but that Northland essentially ignored these withdrawals in its Rule 11 motion. Third, it states that Northland itself has admitted that a large number of Cincinnati's defenses are, in fact, applicable, and it therefore asserts bad faith on the part of Northland for bringing a motion for sanctions on the basis of defenses it admits are viable.

At the outset, it should be noted that Northland's interrogatories are not at issue in the motion before me. Regardless of whether Northland exceeded the number interrogatories allowed or contention interrogatories are improper (which is doubtful), Northland's motion for Rule 11 sanctions is based on its contention that Cincinnati asserted defenses to coverage under its policies for which it has no evidentiary support. If Northland's assertion is wrong, Cincinnati should say so now and not complain about the interrogatories Northland served on it in an attempt to discover what evidence it had.

On that question, Northland is persuasive that Cincinnati's affirmative defenses read like a check-the-box denial of liability on every conceivable basis allowed for under the policies. Under

4

Rule 11(b)(3), an attorney signing a pleading certifies that the allegations have evidentiary support, or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. When the attorney later agrees to withdraw those claims, that is some evidence that they were not supported at the outset. Rule 11 is quite clear that pleadings are not intended to be catch-all assertions of any potentially available defenses; instead, they are meant to structure the lawsuit and highlight which issues are in dispute and which are not. And, given the liberal allowance of amendments to pleadings, parties should not be overly concerned that they might waive defenses or claims that might later appear to be available.

A careful reading of Cincinnati's counterclaim also reveals that several of the exclusions it cites apply to coverages that Northland concedes do not apply in this case. For example, Northland cites Cincinnati's assertion of the exclusion for personal injury arising out of a violation of a penal statute or ordinance committed by or with the consent of the insured (¶ 10 u(iii)), and claims Cincinnati had no factual basis for asserting this exclusion. (Northland's Mem. in Supp. at 1-2.) But as Northland's counsel acknowledged at the hearing on its motion, Northland is not claiming coverage for personal injury. Thus, Cincinnati's assertion of this exclusion makes no difference. Moreover, Cincinnati agreed to withdraw the same exclusion to the other coverages, and reasonably argues that its failure to include exclusion 10 u(iii) was simply an oversight. Cincinnati should not be sanctioned for exclusions and defenses to coverage it agreed to withdraw during the safe harbor period, even if they lacked evidentiary support right from the beginning.

As to some of the other exclusions that Northland challenges, I am unable to say on this record that they are without any basis. Paragraphs 10 u(iv) and 10 i(iii) of the counterclaim, for example, relating to expected or intended injury and known loss, may be relevant since Armament

5

has alleged that Northland falsely represented that its flashlights were made in the United States. Armament's theory seems to be that Northland falsely stated their flashlight was made in the United States, hoping that people would be more inclined to buy it, as opposed to one not made in this country or a more expensive one that actually was made here. If this is true, it is not unreasonable, at least on the record as it now stands, to infer from the allegations of Armament's complaint that Northland may have expected or known that a loss may result. Rule 11 does not require that the facts alleged be undisputed; only that there be some evidentiary support.

With respect to many of the other policy provisions cited by Cincinnati in its counterclaim, it appears there is no dispute that coverage is not provided. Northland is not claiming coverage, for example, under the bodily injury or property damage coverage provisions. Thus, Cincinnati's assertion that no coverage is provided under these provisions is undisputed. The problem is not that the assertions that there is no coverage under these provisions are without factual support; the problem is that they are irrelevant, clutter up the pleadings and provide fuel for the fires of litigation, thereby needlessly increasing the costs of litigation for the parties and wasting the resources of the court. In this court's view, Cincinnati would do well to limit the allegations of its pleadings to reflect what the real dispute is in the case. But I do not find its failure to do so a violation of Rule 11.

Still, Cincinnati has refused to withdraw several exclusions it asserted in its counterclaim for which it admits it presently has no factual support and where none is apparent from the record. These include, for example, the assertions that "[t]here is no coverage to the extent Northland made misrepresentations or failures to disclose when it applied for the Policies (Counterclaim, ¶ 10 w.); that an exclusion for advertising injury arising out of the wrong description of the price of goods,

6

products or services may apply (¶ 10 i.(iii)); and that some or all of the alleged offenses may not have occurred within the policy period (¶10 g. and s.). Cincinnati's explanation for including these allegations and refusing to withdraw them is that these are the kind of defenses that commonly arise in cases of this nature, and it needs limited discovery to assure itself they are not applicable here. Counsel for Cincinnati argued at hearing on the motion that this is the way litigation over insurance coverage is conducted.

I am not convinced that this is or should be the way insurance coverage litigation is conducted. As already noted, Rule 11 does not permit parties to make factual allegations without any basis and rely on discovery to determine if they have a claim or defense. It is precisely this approach that Rule 11 is intended to discourage. *Johnson v. A. W. Chesterton Co.*, 18 F.3d 1362, 1366 (7th Cir. 1994). Cincinnati suggests in its brief that by stating that these policy defenses or exclusions "may apply" (Counterclaim ¶ 10 h. and i.), it was in effect invoking Rule 11(b)(3), which allows a party to include factual allegations that lack evidentiary support if it appears that they will have evidentiary support after a reasonable opportunity for discovery or further investigation. (Br. In Opp. at 22, n. 25.) Even under this rule, however, a party must at least have reason to believe that evidentiary support will be forthcoming. *Macken v. Jensen*, 333 F.3d 797, 800 (7th Cir. 2003). Cincinnati has offered none. Contrary to Cincinnati's contention, Rule 11 does not authorize a party to make factual allegations without any reason to believe they may be true simply to avoid waiver.

Cincinnati has only compounded the problem by the manner in which it has responded to Northland's motion for Rule 11 sanctions. Instead of simply responding to Northland's legitimate demand that it either disclose the evidentiary support for its defenses or withdraw them, counsel for Cincinnati attacked the integrity of counsel for Northland, threatening to file his own Rule 11

7

motion and disclose information that had been confidentially shared in an effort to settle the dispute. (Aff. of Thomas J. Leach ¶¶ 4-7.) Following through on his threat, counsel for Cincinnati claims that Northland should be sanctioned under Rule 11 because its own Rule 11 motion was baseless and motivated by Northland's intent to "coerce Cincinnati into paying Northland's legal bills and to intimidate and bludgeon Cincinnati into a settlement on Northland's terms." (Br. in Opp. at 23.)

It follows from what I have already said that I do not find Northland's conduct deserving of Rule 11 sanctions. This is not to say that I find support for its claim that "Cincinnati has asserted literally dozens of affirmative defenses and counterclaims for which it had no factual basis." (Mem. in Supp. at 1.) As Cincinnati points out, Northland concedes coverage does not exist under many of the provisions cited by Cincinnati, and Cincinnati had already agreed to withdraw several of the exclusions cited by Northland before it filed its motion. While Northland may have overstated its case, I do not find its conduct sanctionable. Confronted with a confusing pleading asserting numerous policy provisions and exclusions that appeared to have no bearing on the dispute between the parties, Northland attempted to determine the factual basis for each. I reject Cincinnati's contention that Northland's resort to Rule 11 under the circumstances manifests its own bad faith; nor do I find that Northland's motion itself warrants sanctions under Rule 11. Instead, I will limit the sanction imposed on Cincinnati by directing it to pay Northland's attorneys fees and costs attributable to only those defenses that I have found lack evidentiary support. These include Counterclaim ¶ 10 g, i(iii), s and w.

Accordingly, for the reasons set forth above, Northland's motion for sanctions under Rule 11 is granted. The coverage defenses or exclusions set forth in Cincinnati's Counterclaim at ¶ 10, subparagraphs g, i(iii), s and w are struck. If and when Cincinnati discovers an evidentiary basis

8

for such defenses, it may move to amend its counterclaim. Northland is awarded that portion of its costs and attorney's fees attributable to litigating these defenses to coverage and shall file an affidavit in support of such amount within the next twenty days. Cincinnati shall have fourteen days to respond.

**SO ORDERED** this   29th   day of December, 2005.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge